IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| John F. Floyd, Gordon Farms Inc., | ) | Case No. 7:20-cv-01305-JDA |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | **OPINION AND ORDER** |
| | ) | |
| v. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| City of Spartanburg South Carolina, | ) | |
| | ) | |
| Defendant/Counter-Claimant. | ) | |

This matter is before the Court following a bench trial held on September 5 through 8, 2023.  [Docs. 141, 142, 143, 149.]

**INTRODUCTION AND PROCEDURAL HISTORY**

Plaintiffs/Counter-Defendants ("Plaintiffs") filed this action on April 6, 2020, asserting various claims arising out of agreements the parties made relating to the costs of redeveloping a shopping center.  [Doc. 1.]  On June 5, 2020, Defendant/Counter-Claimant City of Spartanburg, South Carolina ("the City") filed an Answer and Counterclaim and subsequently filed an Amended Answer and Counterclaim.  [Docs. 6; 22.]  Plaintiffs filed an Answer to the Amended Counterclaims on August 25, 2020.  [Doc. 23.]

Plaintiffs' Complaint asserted claims against the City for (1) breach of contract—Intergovernmental Agreement (as a third-party beneficiary), (2) breach of contract, (3) breach of contract—implied covenant of good faith and fair dealing, (4) breach of contract accompanied by a fraudulent act, (5) unjust enrichment/quantum meruit, and (6) promissory estoppel.  [Doc. 1 ¶¶ 53–90.]  The City asserted counterclaims against Plaintiffs for (1) unjust enrichment and (2) breach of contract—implied covenant of good faith and fair dealing.  [Doc. 22 ¶¶ 131–40.]  On March 16, 2022, this Court granted in part

and denied in part the parties' cross motions for summary judgment, thereby eliminating some of the claims and counterclaims originally asserted. [Doc. 71; *see* Doc. 59.] Plaintiffs also stipulated to the dismissal of two additional claims on June 23, 2022. [Doc. 95.]

On December 19, 2022, after the parties consented to a trial before a U.S. Magistrate Judge, the case was referred to the undersigned. [Doc. 117.] After the parties agreed to a bench trial [Doc. 124], the undersigned scheduled a bench trial on the remaining claims: Plaintiffs' claims against the City for breach of contract and breach of contract—implied covenant of good faith and fair dealing; and the City's counterclaim against Plaintiffs for unjust enrichment. During the trial, Plaintiffs agreed that their two breach of contract claims merged into a single claim. [Tr. 228:21–229:17.] At the conclusion of the City's case, Plaintiffs moved for judgment on partial findings as to the City's remaining counterclaim for unjust enrichment, *see* Fed. R. Civ. P. 52(c), and the Court granted the motion [Tr. 750:11–762:25, 768:4–769:23]. The sole remaining claim in this case is Plaintiffs' claim against the City for breach of contract. [Doc. 1 ¶¶ 60–67.] Plaintiffs seek money damages and attorneys' fees. [*Id.* at 25.]

On September 25, 2023, the parties submitted proposed findings of fact and conclusions of law addressing the remaining claim. Having considered the testimony, exhibits, trial briefs, and proposed findings of facts and conclusions of law, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[1] Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without

---

[1]To the extent that any Findings of Fact constitute Conclusions of Law, or vice versa, they shall be adopted as such.

a jury . . . , the court must find the facts specially and state its conclusions of law separately.").

## <u>FINDINGS OF FACT</u>

**The Parties**

1.      Gordon Farms, Inc. ("Gordon Farms") is a Florida corporation with its principal place of business in Florida.  *See* Florida Department of State/ Division of Corporations, https://search.sunbiz.org/Inquiry/CorporationSearch/ByName (search by name) (last visited Sept. 30, 2023).

2.      John Floyd is an owner and president of Gordon Farms and is a resident and citizen of Florida.  [*Id.* at  2; Tr. 42:6–7, 44:9–10; Def. Ex. 22 at 2.]

3.      The City is a municipal corporation existing pursuant to the laws of the State of South Carolina.  [Docs 1 ¶ 4; 22 ¶ 5; 23 ¶ 5.]

**The Business Corridor Redevelopment Program and Intergovernmental Agreement**

4.      On December 14, 1998, the City and Spartanburg County ("the County") entered into the Intergovernmental Agreement ("IGA") for the purpose of developing "an incentive program to stimulate commercial redevelopment of vacant, physically declining, or underperforming commercial properties within the City."  [Pls. Ex. 16 at 1, 8.]

5.      In support of that purpose, and along with an agreement between the County and Union County, the IGA created a multi-county industrial and business park ("MCIP"). [*Id.* at 1.]

6.    Under the IGA, property owners approved for inclusion in the MCIP received annual fee-in-lieu-of-tax rebates ("rebates") for redeveloping a property within a rebate incentive program ("the Program").[2]  [*Id.* ¶ 5(C).]

7.    The IGA specified the qualifications for inclusion in the Program, including the type of expenses that were considered qualifying redevelopment costs.[3]  [*Id.* ¶ 4.]

8.    Property owners submitted their redevelopment costs to the City and those costs were used each year to determine the amount of the increase in tax revenues that was attributable to the redevelopment of the property ("the Increment").  [*Id.* ¶¶ 4, 5(C).]

9.    Property owners in the Program received a rebate from the City annually in the amount of 30% of the Increment.  [*Id.* ¶ 5(C).]  Those payments continued for a maximum of 15 years or until the sum of the rebates for a particular property reached 20% of the redevelopment basis (the "Cap"), whichever came first.  [*Id.* ¶¶ 4(D), 5(F), 5(G).]

10.    The fee-in-lieu-of-tax revenue attributable to participating properties was distributed as follows:

a.    The pre-development fee-in-lieu-of-tax revenues ("Baseline") attributable to the participating property were distributed to taxing entities, such as school districts, fire districts, and municipalities.  [*Id.* ¶ 5(B).]

---

[2]The City's Rule 30(b)(6) representative explained that taxes cannot legally be rebated, but fees can be, and thus the money property owners were paying was treated as fees.  [Tr. 334:23–335:4.]

[3]The IGA provided that "[e]ligible redevelopment costs include land (per pre-development assessment value), demolition, site preparation (grading and underground utilities), building construction, site improvements (parking, walks, landscaping, lighting), and design fees."  [Pls. Ex. 16 ¶ 5(F).]  The IGA states that "[c]osts must be documented and certified to the City, which must then certify to the County that the affected property is eligible for Park inclusion."  [*Id.*]

b.      Thirty percent of the Increment was distributed to the participating property owners; 30 percent of the Increment was distributed to the same taxing entities referenced above; and the City received the other 40 percent of the Increment to use for economic development purposes, less one percent, which was forwarded to Union County.  [*Id.* ¶  5(C), 5(D), 5(E).]

**The Hillcrest Shopping Center and Its Inclusion in the Program**

11.      Gordon Farms is a real estate development company that was founded by Mr. Floyd's father and has been in Mr. Floyd's family since 1957.  [Tr. 44:1–8, 87:2–4.] Gordon Farms started with two properties, Hillcrest Shopping Center (the "Shopping Center") and Hillbrook Subdivision.  [Tr. 44:4–5.]  Mr. Floyd eventually took over the business of Gordon Farms from his father.  [Tr. 44:9–10.]

12.      The Shopping Center is located at the intersection of East Main Street and Fernwood Glendale Road in Spartanburg, South Carolina.  [Tr. 44:12–17.]

13.      Mr. Floyd and Jim Wilson built the Shopping Center in the 1980s. [Tr. 44:22–45:1.]  Originally, the Shopping Center was a strip center, and an interior shopping mall was eventually added. [Tr. 45:2–10.] In the mall, there were two department stores and a number of national tenants.  [Tr. 45:12–46:5.]

14.      In the late-1990s, Mr. Floyd was exploring options to renovate the Shopping Center site due to its declining performance.  [Tr. 46:6–48:9.]  The costs of the anticipated redevelopment work, which included demolition activities, were high, and a banker recommended that Mr. Floyd seek help from the City.  [Tr. 48:5–19.]  Consequently, Mr. Floyd contacted Roy Lane, the City Manager at the time, to inquire about whether the City

5

would be able to provide any financial assistance with the redevelopment project. [Def. Ex. 3.]

15.    Subsequently, the Program was enacted by the Agreement for Development of Joint County Industrial and Business Park Within the City of Spartanburg, South Carolina between the County and Union County, and by the IGA between the County and the City. [Pls. Ex. 41; Pls. Ex. 16.]

16.    In 1998, Mr. Floyd and Gordon Farms began significant redevelopment work on the Shopping Center. [Tr. 48:21–49:7[4].] The redevelopment work involved demolishing the department stores and mall portion of the Shopping Center, as well as building new tenant spaces. [Tr. 49:8–14.] The total cost of redevelopment work was close to $18 million. [Tr. 56:14–57:2.]

17.    Mr. Floyd met with Ed Memmott, who was then the City's Community Development Director, to get the the Shopping Center included in the Program and to help with redevelopment costs. [Tr. 58:25–59:11, 445:3–5.]

18.    The City Council approved the Shopping Center for inclusion in the Program via Resolution on August 9, 1999. [Pls. Ex. 111.] The County Council approved the Shopping Center for inclusion in the Program via Resolution #R-00-048 on June 19, 2000. [Pls. Ex. 109.]

19.    At the time of its inclusion in the Program, the Shopping Center was comprised of ten parcels. [*See* Pls. Ex. 111 at Ex. A; Pls. Ex. 109 at Ex. A.] However, certain parcels were later subdivided such that the Shopping Center was then comprised

---

[4] The transcript reflects that Mr. Floyd testified at one point that redevelopment began around 1988 [Tr. 48:21–49:7], but that appears to be a mistake.

of 12 parcels.  [Tr. 364:8–365:9.] Thus, all 12 parcels were properly included in the Program.  [*Id.*]

20.     The City did not have a written agreement with Mr. Floyd concerning the Shopping Center's inclusion in the Program.  [Tr. 59:13–15.]  In fact, Julie Franklin, the City's Economic Development Director from 2005 through 2008, could not find any written agreements with any participating property owners—except for one—that set out the original entity eligible to receive the rebates.  [Tr. 587:2–11, 593:13–17, 598:5–599:7.] Additionally, Mr. Floyd was not provided with a copy of the IGA and did not know it existed. [Tr. 60:8–15.]

21.     On June 29, 2000, Rodrick Banks from the City's Economic Development Division wrote a letter to Mr. Floyd informing him that, among other calculations, the Cap for the Shopping Center was $3,046,101.00 (20 percent of the redevelopment basis).  [Pls. Ex. 1; Tr. 62:1–63:10.]

22.     Tax year 2000 was the first year that the Shopping Center was eligible to receive fee rebate payments under the Program.  [Tr. 64:24–65:1.]

23.     The City sent Mr. Floyd his first annual fee rebate payment under the Program for tax year 2000 on March 19, 2001, in the amount of $72,945.00, which included rebate amounts for each of the parcels comprising the Shopping Center.  [Tr. 69:6–12, Pls. Ex. 7a.]  Accordingly, Mr. Floyd was entitled to receive annual fee rebate payments for the Shopping Center through his payment for tax year 2014 or until his payments totaled the Cap amount, which ever came first.  [Pls. Ex. 16 ¶¶ 4(D), 5(F), (G); Tr. 63:24–64:3.]

**The K-Mart Parcel and the K-Mart Agreement**

24.    The Shopping Center experienced success following the significant redevelopment work in the late-1990s.  [Tr. 57:6–58:5.]

25.    However, around 2002, one of the Shopping Center's anchor tenants that was located on one parcel of the Shopping Center Property, TMS# 7-09-14-096.06 (the "K-Mart Parcel"), filed for bankruptcy, and the K-Mart store in the Shopping Center subsequently closed.  [Tr. 80:24–81:6, Pls. 7f.]

26.    K-Mart's closure was a significant and detrimental event for the Shopping Center and the City.  [Tr. 81:7–82:10.]  As a result, the City was concerned about the future of the site.  [Tr. 179:19–21, 500:23–501:15.]  Mr. Floyd also was concerned about what to do with the K-Mart Parcel because it was a large space—approximately 30 percent of the total square footage of the Shopping Center—that needed to be redeveloped to bring in new tenants.  [Tr. 81:7–82:4.]

27.    As a result, Mr. Floyd engaged in discussions with the City to determine if it could provide any assistance with the anticipated and necessary demolition and redevelopment of the K-Mart Parcel.  [Tr. 81:15–83:2.]

28.    Mr. Floyd and the City initially discussed an agreement in which the K-Mart Parcel would be removed from the then-current MCIP designation and re-designated under the Program, an option that would require Mr. Floyd to submit certification of qualifying redevelopment costs to the City, the City to recalculate the redevelopment basis and Cap for the individual parcel, and City Council and County Council to approve the parcel's re-inclusion in the Program via resolution.  [Tr. 525:9–526:3; Pls. Ex. 19.]

8

29.     This potential solution was described in an August 23, 2004, letter from Rodrick Banks, on behalf of the City, to John Floyd.  [Pls. Ex. 19.]

30.     The parties eventually decided against that option because Mr. Memmott was concerned they would not be able to obtain the necessary approval from City Council and County Council. [Tr. 485:13–486:3, 526:20–527:3.] After Mr. Memmott, then Assistant City Manager with the City [Tr. 91:19–21], engaged in conversations with City Manager Mark Scott and City Attorney Spencer King, "the decision was" made that the City would provide the reboot for the K-Mart Parcel "administratively" rather than taking the formal steps outlined in Mr. Banks' letter.  [Tr. 486:3–9.]

31.     Thus, Mr. Memmott, acting in his official capacity with the City, agreed, for just the K-Mart Parcel, to extend the rebate period beyond its initial 15 years without requiring the City to recalculate a redevelopment basis or Cap, or City Council or County Council approval (the "K-Mart Agreement").  [Tr. 83:7–84:21, 503:6–13, 525:9–527:23.] The new 15-year period would start when the redevelopment work on the K-Mart Parcel was completed.  [Tr. 83:14–16.]

32.     In reaching the K-Mart Agreement, Mr. Memmott did not engage with or seek approval from the County and he did not know whether Mr. Scott did either. [Tr. 520:18–21[5].] The K-Mart Agreement was not reduced to writing. [Tr. 523:3–8.] Based on the completion date of the K-Mart Parcel renovation, the new 15-year rebate period for

---

[5] There appears to be an error in the transcript, which refers to whether Mr. Memmott knew whether Mr. Scott "engaged with the party about the extension," but the Court believes that the question actually asked about "the County," rather than "the party."

that parcel would have begun in tax year 2006 under the K-Mart Agreement. [Tr. 488:13–17; Def. Exs. 47, 48.]

**Sale of the Shopping Center and the Extended Agreement**

33.     By mid-2004, the Shopping Center was generating a total revenue stream of about $3 million, and between $1 million and $2 million of that revenue stream was profit. [Tr. 86:12–25.] Mr. Floyd had been planning to turn the Shopping Center and its operation over to his son, John Warren Floyd ("John Warren"), who was in the process of earning his Master's Degree in Real Estate from the University of Florida. [Tr. 87:5–15.] Mr. Floyd planned to retire and move to Florida and for John Warren to earn his livelihood by operating the Shopping Center. [Tr. 87:16–88:3.]

34.     John Warren had grown up working for Gordon Farms and returned to work for Gordon Farms at the Shopping Center after he graduated from Wofford College in 1999. [Tr. 397:25–398:15.] He then attended graduate school at the University of Florida and earned a Master's Degree in Real Estate Development because he had planned to take over the operation and management of the Shopping Center from Mr. Floyd and eventually pass that business on to his own children. [Tr. 397:10–14, 399:2–25.]

35.     However, in 2004, Mr. Floyd was approached regarding the possibility of selling the Shopping Center to a company called Excel Realty Partners, L.P. ("Excel"), sometimes referred to as "New Plan," and he began to consider selling the Shopping Center to Excel. [Tr. 88:4–16, Pls. Ex. 61.]

36.     Excel's underwriting team used a commercial property valuation software program called ARGUS to calculate the value of the Shopping Center. [Tr. 400:11–401:25.] The Shopping Center was determined to be worth $36 million, using a cap rate of eight

percent.  [Tr. 401:20–25, 403:20–23.]  Additionally, Mr. Floyd testified that he would have been willing to sell the Shopping Center for $36 million.  [Tr. 304:25–305:4.]

37.     During the course of Excel's due diligence, an issue came up about the portion of the Shopping Center known as Specialty Row.  [Tr. 89:13–24.]  Specifically, Mr. Floyd learned the City would require the buyer of the Shopping Center to upgrade Specialty Row to the latest fire and building codes and to comply with the Americans with Disabilities Act.  [Tr. 89:13–90:12, 105:8–16.]

38.     Due to the cost of the necessary renovations to Specialty Row, which was expected to be about $4 million, the potential sale to Excel was threatened, with the deal going "pencils down" for a time.  [Tr. 90:19–91:1, 92:11–14, 402:22–403:6.]

39.     Mr. Floyd contemplated whether he should sell the Shopping Center for a lower price or whether he should continue to operate it, receive the large revenue streams being generated, turn it over to his son to operate, and retire to Florida.  [Tr. 92:17–24, 97:5–16.]

40.     John Warren and Mr. Floyd discussed the implications of the sale, including its effect on the career John Warren had been preparing for and the family legacy of the property.  [Tr. 403:17–404:13.]

41.     Mr. Floyd called Mr. Memmott to ask if there were any way for him to sell to Excel without the City requiring the renovations to Specialty Row, but Mr. Memmott told him there was not.  [Tr. 91:3–10, 92:6–13.]

42.     According to Mr. Floyd, Mr. Floyd told Mr. Memmott that he was inclined not to sell to Excel because he would do better keeping the Shopping Center and its income stream.  [Tr. 92:17–24.]   However, Mr. Memmott told Mr. Floyd that the City wanted the

sale to go through because the sale and renovations would generate more tax revenue, national tenants that would pay higher rents would be added to the Shopping Center, and the upgrades to the Shopping Center would generally be positive.  [Tr. 93:20–25.]

43.      Mr. Floyd testified that Mr. Memmott then made an offer on behalf of the City that could benefit both parties: if Gordon Farms would sell the Shopping Center (through its wholly owned subsidiary, Hillcrest Shopping Complex, LLC, which was the owner of the property) to Excel, the City would restart the 15-year rebate period for the entire Shopping Center, rather than only for the K-Mart Parcel as the City had previously agreed.[6] [Tr. 92:15–94:13, 99:25–100:11, 104:14–21.]

44.      According to Mr. Floyd, under the terms of the agreement Mr. Memmott offered ("the Extended Agreement"), the additional 15-year annual fee rebate period would begin once the work on Specialty Row was complete, and, as with the K-Mart Agreement, the Cap, pre-development basis, and redevelopment basis would all remain the same. [Tr. 95:9–23.]   Additionally, because Gordon Farms would essentially be funding the redevelopment work by selling the Shopping Center for less than $36 million, future rebate payments would be made to Gordon Farms, rather than to Mr. Floyd individually. [Tr. 100:13–101:4, 104:14–18.]

45.      On behalf of Gordon Farms, Mr. Floyd told Mr. Memmott that he accepted the City's offer.  [Tr. 96:21–23.]

---

[6] The timing of Mr. Floyd's discussions with Mr. Memmott regarding the sale of Excel, the renovations that would be required if the sale occurred, and the offer and acceptance of the Extended Agreement are not entirely clear from the record.  However, the Court's analysis does not depend upon resolution of the exact chronology.

12

46.    Like the K-Mart Agreement, the Extended Agreement was not memorialized in writing.  [Tr. 98:14–20, 523:3–8.]

47.    The additional $2.5 million that Mr. Floyd expected Gordon Farms would receive as a result of the Extended Agreement would allow Gordon Farms to recoup some of the money it would lose from selling the Shopping Center for less than $36 million and it was sufficient to convince him to sell to Excel.  [Tr. 92:15–93:19, 94:10–13, 96:16–20.]

48.    With the Extended Agreement in place, Gordon Farms and Excel were able to reach a tentative agreement.  [Pls. Ex. 61.]  Part of the terms the parties had negotiated to that point were reflected in the "Contribution Agreement," a portion of which Gordon Farms produced during discovery.[7]  [*Id.*]  Under that agreement, the sales price was $32.8 million.  [*Id.* at 3.]

49.    Gordon Farms held a special meeting of stockholders on September 13, 2004, approved the proposed Contribution Agreement, and authorized Mr. Floyd as Gordon Farms' president to execute that agreement and to take other steps needed to finalize the deal.  [Def. Ex. 22.]

50.    At a Christmas party that year, Mr. Floyd thanked the Mayor of the City for what the City was doing in connection with the Extended Agreement.  [Tr. 294:2–15.]  He also informed the Mayor that a fountain would be built on the Shopping Center property at the corner of East Main Street and Fernwood Glendale Road because the City had wanted a fountain at that location since 2000.  [Tr. 98:24–99:14.]

---

[7] In arguing for motion for judgment on partial findings after the close of Plaintiffs' case, the City recognized that the Contribution Agreement was merely an "initial offer" and that Excel at closing ended up paying less than the $32.8 million offered in the Contribution Agreement.  [Tr. 428:9–18.]

51.     In line with the Extended Agreement, Mr. Floyd had his corporate attorney write the City and ask that the rebates from the Program be sent to Gordon Farms rather that Mr. Floyd.  [Tr. 100:25–101:4.]

52.     Following the sale of the Shopping Center, which closed on about February 16, 2005, Excel made significant renovations to Specialty Row, including adding fire sprinklers to the spaces, an elevator, rear exits to the spaces, a balcony across the rear of Specialty Row, a loop corridor on the ground floor, a new façade, new signage, fire alarms, emergency lights, fire protection, plumbing work, landscaping and drainage work, accessibility to restrooms, lighting fixtures, and the fountain Mr. Floyd had promised the Mayor.  [Tr. 105:1–106:25, 227:4–7, 247:22–251:8.]  These renovations, which were completed in 2007, improved the curb appeal of the Shopping Center, brought it up to applicable codes, led to national tenants leasing space in the Shopping Center, increased rents, and caused property taxes to increase.  [Tr. 94:2–9, 98:1–7, 118:20–119:3, 121:16–24; *see also* Pls. Ex. 23.]  All of these factors benefitted the City.  [Tr. 550:4–25.]

53.     Moreover, the tax revenue generated by the Shopping Center under the Program and paid to the City for each tax year (40 percent of the Increment) reflects those positive changes:

| Tax Year | 40% Increment Payment to the City Attributable to the Shopping Center |
| --- | --- |
| 2000 | $97,665.00 |
| 2001 | $114,994.00 |
| 2002 | $98,851.00 |
| 2003 | $98,643.00 |
| 2004 | $105,222.00 |

14

2005          $113,794.00

2006          $150,339.00

2007          $168,302.00

2008          $186,747.00

2009          $201,961.00

2010          $217,995.00

[Pls. Ex. 98 at 12–13.]

54.     This data shows that in the five years before the Shopping Center was sold (2000 through 2004), the portion of the Increment that the City received increased by only four percent.  In the five years after the Shopping Center was sold (2006 through 2010), the portion of the Increment that the City received increased by 82 percent. [Tr. 275:8–280:6.]

55.     On December 21, 2005, Gordon Farms' corporate attorney, James Drennan, sent a letter to Mr. King confirming that Gordon Farms' sale of the Shopping Center did not include the rights to rebates under the Program, and he attached pages 2 and 3 of the Contribution Agreement, calling attention to paragraph 1.8.  [Tr. 188:7–8; Def. Ex. 29.] That paragraph provided that Gordon Farms and its predecessors had been entitled to rebate payments under the Program based on its 1999 renovations and that it also anticipated rebates from its renovation of the K-Mart Parcel, and it stated that they retained the rights to the rebates after the sale to Excel.  [*Id.*]  Mr. Drennan sent a copy of the letter to Mr. Floyd.  [Tr. 188:7–8; Def. Ex. 29.]

56.     Beginning with the rebate payment for tax year 2005, which was paid on March 28, 2006, the annual fee rebate payments for the Shopping Center began to be

15

made to Gordon Farms, rather than to Mr. Floyd.  [Pls. Ex. 7f.]  Gordon Farms then received its next payment in April 2007.  [Pls. Ex. 7g.]

57.    On April 4, 2008, Ms. Franklin sent Mr. Floyd a letter asking Mr. Floyd to confirm that, after the sale of the Shopping Center to Excel, Gordon Farms retained the right to receive the annual rebates under the Program. [Pls. Ex. 5.]  When Mr. Floyd received the letter, he telephoned Ms. Franklin because he was confused as to the letter's purpose.  [Tr. 124:24–25.]  Mr. Floyd testified that in response, Ms. Franklin told him that the letter signified the start of the new 15-year rebate period for the Shopping Center and verified the parcels included in the Program.  [Tr. 125:2–10.]

58.    Ms. Franklin had sent several similar letters to other participants in the Program in 2006, 2007, and 2008 asking for clarification as to which entity was entitled to receive rebates, including one letter sent the day before the one that she sent to Mr. Floyd. [*Id.*]  Ms. Franklin testified that her April 4, 2008, letter to Mr. Floyd, to the best of her recollection, appeared to have been sent for the same reason.  [Tr. 592:20–593:3.] However, she was not asked by either party about a conversation that she may have had with Mr. Floyd after he received the letter.  [Tr. 586–649.]

**The City's Records**

59.    The City used a spreadsheet to track the payments made to developers under the Program and the last tax year for which a payment would be due in the event the Cap was not satisfied first.  [Tr. 710:12.]  The spreadsheet was one that Ms. Franklin had passed on to Dennis Locke, the City's Director of Finance, prior to the end of her employment with the City in 2008.  [Tr. 587:2–9, 682:17–19, 710:12–15; Pls. Ex. 25.]  In 2015, Patty Bock, the City's Economic Development Director, added to the spreadsheet

16

the end dates for the 15-year period for each property in the Program. [Tr. 685:6–12, 710:23–25[8], 711:1–4, 718:24–25.] Every year Mr. Locke's assistant updated the spreadsheet to reflect the year's payments and then both Mr. Locke and his assistant reviewed the spreadsheet to make sure that developers were not receiving payments after their pay period had expired. [Tr. 713:18–24.]

60.    Mr. Memmott knew that the City used the spreadsheet for that purpose and that the spreadsheet contained an end date for each agreement. [Tr. 715:12–716:19.] In fact, Mr. Locke sent Mr. Memmott copies of the spreadsheet. [Tr. 717:17–718:3; Pls. Ex. 25.] The spreadsheet the City used had a row for the Shopping Center but, prior to the beginning of the dispute with Mr. Floyd in November 2017, it had no separate row for the K-Mart Parcel, and nothing on the spreadsheet showed the K-Mart Parcel having a different rebate period than the rest of the Shopping Center. [Tr. 522:23–523:2, 714:18–715:10.] Nonetheless, Mr. Memmott never told Mr. Locke that the expiration date for the K-Mart Parcel was different from that of the Shopping Center. [Tr. 718:4–10.]

**The Overpayment Letters**

61.    Gordon Farms continued receiving annual fee rebate payments for the Shopping Center through tax year 2016. [*See* Pls. Exs. 7a–7q (reflecting the payments made by the City to Mr. Floyd and Gordon Farms under the Program from tax year 2000 through tax year 2016).]

62.    On November 6, 2017, Mr. Locke sent an email to Mr. Memmott, who was the City Manager at the time, and copied Ms. Bock and Assistant City Manager Chris Story.

---

[8]The transcript includes a reference to "Betty" Bock, but that appears to be a mistake.

[Tr. 689:8–10; Def. Ex. 41.]  In the email, Mr. Locke informed Mr. Memmott that "[w]hile reviewing the MCIP payment for the audit this year we discovered an error."  [*Id.*]  Mr. Locke stated that the City had overpaid one year of annual fee rebate payments for the Shopping Center, in the amount of $181,147.00.  [*Id.*]

63.     In an email response, Mr. Memmott copied the City Attorney, Cathy McCabe, and wrote, "Not good.  Keep me and Cathy posted."  [*Id.*]  Mr. Memmott did not mention the K-Mart Agreement at that time, nor did he mention it in subsequent conversations with Mr. Locke in which they discussed how to handle the situation. [Tr. 559:16–23, 559:25–560:3.]

64.     On November 15, 2017, Mr. Locke sent a letter to Plaintiffs, copying Mr. Memmott and Ms. McCabe, indicating that the tax year 2016 annual fee rebate payment to Gordon Farms was made in error (the "First Overpayment Letter").  [Pls. Ex. 10.]  The letter further stated the last payment Gordon Farms should have received was for tax year 2015, and therefore, Plaintiffs were required to return $181,147.16 to the City.  [*Id.*]

65.     Of the $181,147.16 alleged overpayment for tax year 2016, $55,523.04 was attributable to the K-Mart Parcel.  [Pls. Ex. 7q at CITY SBURG 000550.]

66.     At trial, Mr. Memmott admitted that he knew about the K-Mart Agreement when the First Overpayment Letter was sent to Plaintiffs and thus was aware that the letter demanded the return of significant monies—$55,523.04—that Gordon Farms was entitled to under the K-Mart Agreement.  [Tr. 565:22–25.]  Mr. Memmott explained that he did not raise the K-Mart Agreement as an issue at that time because he "was uncertain as to what [Mr. Floyd's] position would be" and "[t]here was time to make sure [they] g[o]t it right[.]" [Tr. 564:21–24, 562:2–7, 561:3–10.]

18

67.    Although Mr. Locke was responsible for ensuring that payments to the property owners in the Program were correct, he had no knowledge of the K-Mart Agreement because Mr. Memmott had never told him about it.  [Tr. 733:8–734:6.]  Had Mr. Memmott told him about that agreement, he would have never asked Mr. Floyd to return money attributable to the K-Mart Parcel.  [Tr. 734:7–735:1.]

68.    John Warren received the First Overpayment Letter at Gordon Farms' office in Spartanburg, and he called Mr. Floyd.  [Tr. 405:16–406:14.]

69.    Mr. Floyd's immediate response was to state that the letter was wrong and that the rebate payments were to continue for a number of years.  [Tr. 406:12–18.]

70.    John Warren and Mr. Floyd proceeded to search records at the Gordon Farms office for relevant documents to demonstrate that the City was obligated to continue to make the payments.  [Tr. 407:7–15.]

71.    Mr. Floyd attended a meeting with Mr. Locke after receiving the First Overpayment letter.  [Tr. 141:7–142:6, 151:5–6.]  By that time, a copy of the August 23, 2004, letter from Mr. Banks to Mr. Floyd concerning the potential agreement regarding the K-Mart Parcel had been discovered.  [Tr. 135:5–13, 407:16–409:3, 493:14–497:9.]

72.    On December 11, 2017, Mr. Locke sent Plaintiffs a second letter regarding the alleged overpayment (the "Second Overpayment Letter").  [Pls. Ex. 11.]  This letter did not admit the existence of the oral K-Mart Agreement, by which the City extended the rebate period on the K-Mart Parcel without City Council or County Council approval.  [*Id.*]  However, the letter stated that, based on the August 23, 2004, letter from Mr. Banks to Mr. Floyd, Gordon Farms was entitled to payments on the K-Mart Parcel only but not for payments for the entire Shopping Center.  [*Id.*]  Thus, the letter stated that the resulting

overpayment was actually $125,624.12 rather than $181,417.16. [*Id.*] The letter stated that in future years the amounts of the rebate payments that Gordon Farms was due for the K-Mart Parcel would be applied toward the alleged $125,624.12 overpayment. [*Id.*]

73. Mr. Memmott, Ms. Bock, and Ms. McCabe were all copied on the Second Overpayment Letter. [*Id.*] The reason the letter did not mention the K-Mart Agreement was that Mr. Memmott had never told Mr. Locke of the existence of that oral agreement. [Tr. 736:18–737:24.]

74. Then, two days later on December 13, 2017, Mr. Locke sent Plaintiffs a third letter, again copying Mr. Memmott, Ms. Bock, and Ms. McCabe (the "Third Overpayment Letter"). [Pls. Ex. 12.] This letter stated that the City had actually overpaid Plaintiffs for two tax years—2015 and 2016—and the total alleged overpayment was $248,297.02, which gave credit for the amount attributable to the K-Mart Parcel. [*Id.*] While this letter again stated that the City would provide rebates for the K-Mart Parcel in light of Mr. Banks' August 23, 2004, letter, it did not mention the oral K-Mart Agreement. [Tr. 745:1–5.]

75. After receiving the Third Overpayment Letter, Mr. Floyd and John Warren met with Mr. Memmott, Mr. Locke, and Mr. Story. [Tr. 141:10–18, 407:16–22, 408:7–14, 572:1–573:3.] The meeting was tense and combative. [Tr. 408:16–409:25.] During that meeting, the City representatives told Mr. Floyd that he "c[ould]n't prove a thing" and demanded that Mr. Floyd show them what proof he had of the Extended Agreement. [Tr. 141:20–142:8.]

76. For each year since tax year 2017, the City has retained the entire 70 percent of the Increment payment attributable to the Shopping Center, that being the 40 percent that the City had been retaining before and the 30 percent that it had previously been

paying to Gordon Farms.  [Pls. Ex. 98 at 13.]  Specifically, the City retained the following amounts:

     a.     Tax Year 2017: $448,494.00

     b.     Tax Year 2018: $491,213.00

     c.     Tax Year 2019: $460,250.00

     d.     Tax Year 2020: $460,250.34

     e.     Tax Year 2021: $462,160.51

[*Id.*]

## CONCLUSIONS OF LAW

**The Court's Jurisdiction**

1.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Diversity jurisdiction requires complete diversity of the parties and an amount in controversy in excess of $75,000.00, exclusive of interest and costs.  See 28 U.S.C. § 1332(a). Complete diversity of the parties in a case means that no party on one side may be a citizen of the same state as any party on the other side.  *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 372 (1978).

**Actions Tried Without a Jury**

2.     "In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).

3.     "Where the Court serves as the trier of fact, it must determine the credibility of witnesses and the weight to be given their testimony."  *Moats Constr., Inc. v. New Beach*

*Constr. Partners, Inc.*, C/A No. 8:17-cv-02009-JDA, 2020 WL 7979018, at *7 (D.S.C. Nov. 30, 2020). "The Court has both the right and the duty to weigh the evidence and to draw reasonable inferences and deductions." *Id.*

**Governing Law**

4.    This action falls under the diversity jurisdiction granted to federal courts pursuant to 28 U.S.C. § 1332, and therefore the laws of South Carolina determine the standards applicable to the breach of contract claim at issue. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

**Plaintiffs' Breach of Contract Claim**

5.    "The elements for breach of contract are the existence of the contract, its breach, and damages caused by such breach." *Branche Builders, Inc. v. Coggins*, 686 S.E.2d 200, 202 (S.C. Ct. App. 2009).

6.    As fully set forth below, the Court concludes that Plaintiffs proved by a preponderance of the evidence each of the elements of breach of contract.

### *Existence of a Contract*

7.    "A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." *Roberts v. Gaskins*, 486 S.E.2d 771, 773 (S.C. Ct. App. 1997).

8.    Plaintiffs allege the existence of an oral contract.  A party alleging the existence of an oral contract "must prove by a preponderance of the evidence that there was a meeting of the minds as to all of the essential and material terms of the alleged agreement." *Landbank Fund VII, LLC v. Dickerson*, 632 S.E.2d 882, 886–87 (S.C. Ct. App. 2006).

9.     Under South Carolina law, "[t]he necessary elements of a contract are an offer, acceptance, and valuable consideration." *Sauner v. Pub. Serv. Auth. of S.C.*, 581 S.E.2d 161, 166 (S.C. 2003).

10.     Valuable consideration is established by showing a benefit to one party and a detriment to the other party. *Young v. AMISUB of S.C., Inc.*, No. 0:18-cv-01601-JMC, 2018 WL 5668619, at *4 (D.S.C. Nov. 1, 2018).

11.     The primary dispute between the parties is the existence of the Extended Agreement alleged by Plaintiffs.  Indeed, the parties presented two completely different versions of events.  Based on the evidence presented at trial, the Court concludes that Plaintiffs carried their burden and demonstrated by a preponderance of the evidence that the Extended Agreement is a valid and enforceable contract between the parties.

<u>Offer and Acceptance</u>

12.     First, the Court concludes that Plaintiffs showed by a preponderance of the evidence that Mr. Memmott, on behalf of the City made an offer, which Mr. Floyd, on behalf of Gordon Farms, accepted.

13.     Several factors enter into the Court's decision that the Extended Agreement was made as Mr. Floyd described it.

14.     Mr. Floyd testified that, after the deal with Excel was threatened because of the upgrades that would be required to Specialty Row in the event of the sale, he called Mr. Memmott to ask if there were any way the City would not require the necessary renovations.  [Tr. 91:3–10, 92:6–13.]  During that conversation, Mr. Memmott, on behalf of the City, offered to restart the 15-year rebate period for the entire Shopping Center, which

would allow Gordon Farms to recoup some of the money it would lose from selling to Excel for less than $36 million. [Tr. 92:15–93:13, 94:10–13.]

15. As to the terms of this offer, Mr. Memmott told Mr. Floyd that if he sold the Shopping Center to Excel, the new 15-year annual fee rebate period would begin once the work on Specialty Row was complete, and the Cap, pre-development basis, and redevelopment basis would all remain the same. [Tr. 92:25–93:13, 95:9–23.] Additionally, future rebate payments would be made to Gordon Farms instead of to Mr. Floyd. [Tr. 100:13–101:4, 104:14–18.]

16. Mr. Floyd accepted the City's offer on behalf of Gordon Farms. [Tr. 96:21–23.]

17. The Court finds Mr. Floyd's testimony about the offer and acceptance to be credible and reliable.

18. Mr. Floyd testified that his decision to sell the Shopping Center—that his family built and that his son had planned to take over and make into his livelihood— depended on the Extended Agreement. [Tr. 87:2–88:3.] Mr. Floyd was confident that his recollection of his conversation with Mr. Memmott that formed the Extended Agreement was correct. [Tr. 95:25–96:12.] The Court reasons that Mr. Floyd's recollection of the discussions regarding the Extended Agreement would be more accurate and reliable than Mr. Memmott's recollection of those discussions, given the great disparity in the importance of those discussions to Mr. Floyd's and Mr. Memmott's respective lives.

19. Further, Mr. Floyd's position since receiving the First Overpayment Letter from the City has been consistent. John Warren received the First Overpayment Letter and called Mr. Floyd to tell him about it. [Tr. 405:16–406:14.] John Warren testified that Mr.

24

Floyd's immediate response was to say that the letter was wrong because the rebate period for the Shopping Center was to continue for a number of years.[9]  [Tr. 406:15–17.]  Mr. Locke also testified that from his first conversation with Mr. Floyd after Mr. Floyd received the First Overpayment Letter, Mr. Floyd maintained that an agreement had been made to extend the annual fee rebate period for the entire Shopping Center.  [Tr. 729:5–731:22.]

20.    Although Mr. Memmott testified vaguely that Mr. Floyd gave varying explanations in his efforts to convince the City that the Extended Agreement was real [Tr. 492:17–25], the Court does not find Mr. Memmott's testimony to be credible on that point, especially because Mr. Memmott did not identify any of the purported additional explanations that Mr. Floyd purportedly gave.

21.    Mr. Floyd also testified that, after receiving Ms. Franklin's April 4, 2008, letter asking Mr. Floyd to confirm that Gordon Farms was the entity entitled to receive annual fee rebate payments for the Shopping Center, he called Ms. Franklin and during the call, Ms. Franklin told Mr. Floyd that the letter signified the start of the new 15-year rebate period for the entire Shopping Center and verified the parcels included in the Program. [Tr. 122:20–125:16.]

_____

[9] The City objected to John Warren's testimony regarding what his father said when John Warren told his father about the letter.  [Tr. 406:19–23.]  The City contended that the testimony was inadmissible hearsay because Mr. Floyd's statement was made out of court and it was offered for the truth of the matter asserted.  [*Id.*]  The Court overruled the objection and allowed the testimony as a present sense impression.  [Tr. 407:1–4.]  Nonetheless, the Court notes that, here, it considers John Warren's testimony not for the truth of what Mr. Floyd said but only as evidence of what Mr. Floyd said, which was the same thing that he continued to say at every stage of this dispute, namely, that the rebate period for the Shopping Center had been due to continue for additional years after the City stopped making payments.

22.    Mr. Floyd's testimony about his 2008 telephone call with Ms. Franklin is unrefuted by any other testimony.  Although the City called Ms. Franklin as a witness at trial, she was not asked any questions about this phone call with Mr. Floyd. [Tr. 585:11–649:10.]  However, in the absence of any more specific testimony from Ms. Franklin, the Court does not view this issue of what Ms. Franklin may have said to Mr. Floyd as tipping the scale substantially for either side.  On the one hand, from the wording of the letter, it seems unlikely that Ms. Franklin sent it with any purpose other than to clarify whether the right to rebates were assigned during the sale of the Shopping Center.  On the other hand, why Ms. Franklin would still be seeking clarification of that issue more than three years after the sale is a question not answered by the evidence.  And even if the letter's primary purpose were to clarify who should receive the rebates, that would not foreclose the possibility that Ms. Franklin may have discussed with Mr. Floyd the fact that a new 15-year period was beginning for Gordon Farms under the Program or that she may have sought verification from him that the listed parcels were correct.  She was not asked if they discussed those issues.

23.    Similarly, the Court does not view the issues regarding the building of the fountain as tipping the scale substantially for either side.  Mr. Floyd testified that he had Excel build the fountain, but he did not point to any contractual language requiring Excel to build it.  [Tr. 99:4–13, 227:12–19.]  On the other hand, his testimony that he told the Mayor that he would have Excel build the fountain was not rebutted, and he testified that the fountain was in fact built.  [Tr. 98:24–99:14, 227:1–7.] Mr. Floyd was clearly not averse to taking parties at their word in undertaking business transactions, and Excel

representatives could well have assured him that they intended to build the fountain if the sale went through, even in the absence of any contractual language on the subject.

24.    In sum, the Court finds Mr. Floyd's testimony about the offer and acceptance to be credible and reliable.

25.    On the other hand, the Court finds Mr. Memmott's testimony about the offer and acceptance to be conflicting and self-serving and lacking in credibility.

26.    As noted, Mr. Memmott testified that although he agreed, on behalf of the City, to restart the annual fee rebate period for the K-Mart Parcel, he did not agree to restart the annual fee rebate period for the entire Shopping Center.  [Tr. 482:22–488:17, 499:9–19.]  As to the K-Mart Agreement, Mr. Memmott testified that K-Mart's bankruptcy and the future of the K-Mart Parcel "was a significant issue" for the City and that "the City was motivated to be helpful on the [K-Mart Parcel]."  [Tr. 500:23–501:5; *see also* Tr. 501:14–15.] According to Mr. Memmott, although the original plan was to seek approval from City Council and County Council to restart the 15-year annual fee rebate period for the K-Mart Parcel, it was unclear whether such approval would be achievable.  [Tr. 485:13–486:3.]  Therefore, after conversations with Mr. Scott, the City Manager, and Mr. King, the City Attorney, "the decision was" made that the K-Mart Agreement would be taken care of "administratively," without the approval of City Council or County Council. [Tr. 486:3–9.] Mr. Memmott testified that under the K-Mart Agreement the City would not calculate a new pre-development basis or Baseline.  [Tr. 519:12–522:7.] And, although Mr. Memmott testified—in contrast to Mr. Floyd—that the City asked Mr. Floyd to submit his redevelopment costs for the K-Mart Parcel, he also testified that he was not aware of any

document showing that the City calculated a new Cap for the K-Mart Parcel. [Tr. 484:11–23, 521:16–522:7.]

27.     Later, when asked about whether he told Mr. Locke about the K-Mart Agreement when the alleged overpayment was discovered in 2017, Mr. Memmott testified that he did not and that his "recollection was that [Mr. Locke] was generally familiar with the [K-Mart Parcel] and its treatment." [Tr. 559:20–561:12.] However, Mr. Locke testified that although it was Mr. Locke's responsibility to ensure payments to participating property owners were correct, Mr. Memmott did not tell him about the K-Mart Agreement. [Tr. 691:12–692:9, 714:12–17, 718:4–719:23, 719:24–720:1, 733:14–734:6, 737:17–738:7.]

28.     After Mr. Locke sent the e-mail to inform Mr. Memmott of the alleged $181,147.00 overpayment to Gordon Farms, Mr. Memmott chose to continue not to inform Mr. Locke about the K-Mart Agreement on the basis that it "didn't seem relevant." [Tr. 559:16–560:3; Def. Ex. 41.]

29.     Mr. Memmott also testified that he did not intend that the City would retain any money it was not owed. [Tr. 564:24–565:6.] However, the First Overpayment Letter in fact requested that Plaintiffs return $181,147.00 to the City, which included the amount attributable to the K-Mart Parcel. [Pls. Ex. 10.] Mr. Memmott knew about the K-Mart Agreement at the time the First Overpayment Letter was sent and allowed City officials to demand at least $55,523.04 that Mr. Memmott knew was not owed by Plaintiffs because "there would be time to deal with" that issue after Mr. Floyd returned the money. [Tr. 560:21–561:10, 562:2–565:25; Def. Ex. 49.] For Mr. Memmott, a public official, to admit that he allowed the City to demand $55,523.04 from Mr. Floyd, a taxpayer, even though he knew Mr. Floyd did not owe that amount causes the Court to question Mr.

28

Memmott's honesty and the credibility of his testimony regarding the existence of the Extended Agreement.

30.    As stated, it was not until Mr. Banks' August 23, 2004, letter was found, which partially supported the existence of the K-Mart Agreement, that the City agreed to continue making rebate payments for the K-Mart Parcel.  [Pls. Ex. 11.]  Even the Second Overpayment Letter did not mention the oral K-Mart Agreement but indicated only that the City was willing to provide further rebate payments for the K-Mart Parcel "based on Mr. Bank[s'] letter."[10]  [*Id.*]

31.    Mr. Memmott's decision not to speak up and admit that he had made the K-Mart Agreement raises the question of whether he was concerned that, if he admitted to having made the K-Mart Agreement and the Extended Agreement without obtaining the approval of City Council, his employment as City Manager could have been negatively impacted.  Mr. Memmott's demonstrated willingness to hide the existence of the K-Mart Agreement, even from Mr. Locke, raises an inference that Mr. Memmott did the same thing with regard to the Extended Agreement.

32.    Further, the Court concludes the distinctions that Mr. Memmott attempted to draw between the K-Mart Agreement, which he eventually admitted to entering into on behalf of the City, and the Extended Agreement, which he denied entering into, are disingenuous.  It appears to the Court that Mr. Memmott, realizing that following the requirements of the IGA might not lead to the result that he and Mr. Floyd preferred, simply

---

[10] The City also denied the existence of the K-Mart Agreement in its Answer and its Amended Answer.  [Docs. 1 ¶¶ 24, 26–27; 6 ¶¶ 25, 27–28; 22 ¶¶ 25, 27–28.]  The Court finds Mr. Memmott and the City's inconsistent positions regarding the K-Mart Agreement to be troubling.

chose to ignore the IGA's requirements and make the agreement that he believed would benefit the City and Mr. Floyd.[11]   Mr. Memmott's suggestion that the IGA might actually have authorized the City to reboot and extend the rebate period for the K-Mart Parcel beyond the initial 15 years allowed by the IGA without the approval of the City Council or County Council or meeting any of the other requirements of the Program is not supported by the evidence or testimony before the Court.[12]   Moreover, Mr. Memmott did not seek to defend that suggestion with any specificity.  In his testimony, he indicates that he discussed this matter with the City Manager and City Attorney [Tr. 485:13–486:9], but he conspicuously avoids testifying that either of them opined that the IGA or any other mechanism would allow the City to administratively enter into the K-Mart Agreement.[13]   Both his actions then, in ignoring the IGA's requirements, and his actions since then, in apparently hiding that he took that action and disingenuously suggesting that the IGA might have justified the K-Mart Agreement, significantly undercut Mr. Memmott's credibility in the eyes of the Court.

33.    The Court also does not find credible Mr. Memmott's testimony that the City had no real interest in whether the Shopping Center was sold to Excel.  [Tr. 502:14–18,

---

[11] As noted, Mr. Floyd was not provided a copy of the IGA and did not even know that the IGA existed.  [Tr. 60:8–15.]

[12] In fact, the City denied in its Amended Answer that the extension for the K-Mart Parcel ever occurred because for such an extension to occur, qualifying redevelopment costs would have had to have been submitted to the City for certification and City Council and County Council would have had to have approved the extension.  [Doc. 22 ¶ 28.]

[13] Even now, the City offers no specific explanation regarding how the K-Mart Agreement could be understood to be consistent with the IGA.  Rather, the City argues that "this case isn't about whether" the IGA allowed the City to "administratively" extend the 15-year rebate period for the K-Mart Parcel.  [Tr. 845:7–8.]

512:21–24.]  The record demonstrates that the City stood to benefit significantly from the Extended Agreement based on the increased tax revenues and Increment amounts that the City could use for economic development purposes after the Shopping Center was sold, Specialty Row was renovated, and new national tenants leased spaces there.  It simply does not make sense that a City employee would not be excited for the City about these prospects, and Mr. Memmott's claim that the City had no real interest in whether the sale occurred only further undercuts Mr. Memmott's overall credibility in the eyes of the Court.

34.    Indeed, the evidence demonstrates that the City benefitted from the sale of the Shopping Center: national tenants leased spaces in Specialty Row and tax revenue increased.  [*See* Pls. Ex. 98; Tr. 94:5–9, 118:20–119:3.]  The evidence demonstrates that the benefits to the City from the K-Mart Agreement and the Extended Agreement were the same.  In both cases, spaces that were partially occupied and not being used for their optimal benefit were significantly renovated such that larger tenants came into the Shopping Center, paid higher rents, and generated higher property taxes.  [Tr. 550:4–25.]

35.    Mr. Memmott testified that the K-Mart Agreement was consistent with the purposes of the Program but that the Extended Agreement would not have been consistent with the purposes of the Program.  [Tr. 499:20–501:19.]  The Court doubts that to be true, but even if it were, there is no reason to believe that Mr. Memmott would have limited himself to pursuing the goals of the Program when he was willing to ignore the Program's requirements and make "administrative" agreements.

36.    That the City's records, upon which the City relied to determine when to stop making payments to owners under the Program, did not reflect any difference in treatment between the K-Mart Parcel and the rest of the Shopping Center is additional strong support

for the Court's finding that Mr. Memmott and Mr. Floyd agreed to the Extended Agreement. [Tr. 712:17–715:10.]  The City offered no explanation for why, if it entered the K-Mart Agreement but not the Extended Agreement, its spreadsheet did not show a different end date for the rebates for the K-Mart Parcel than for the rest of the Shopping Center.

37.     The City points to several documents that it maintains support its version of events.  For example, the August 23, 2004, letter from Mr. Banks to Mr. Floyd summarized then-recent conversations between Mr. Floyd and City staff about the possibility of City staff recommending that the City Council and County Council remove the K-Mart Parcel from the MCIP designation for the Shopping Center and re-designate it under a separate MCIP. [Pls. Ex. 19; *see also* Tr. 833:6–834:8 (City's argument in closing concerning this letter).] That letter predated the K-Mart Agreement [Tr. 527:25–528:3] and the later Extended Agreement.  The City argues that if it had entered into the Extended Agreement, Mr. Banks would have produced a similar letter outlining the terms of that agreement.   [Tr. 833:6–834:8.] The simple response to that argument is that it is doubtful that Mr. Memmott would have told Mr. Banks about the Extended Agreement, or the K-Mart Agreement, for that matter.  Even Mr. Locke, whose job it was to make sure the proper payments were made under the Program, was not told about the K-Mart Agreement.  [Tr. 713:21–24.]

38.     The City also points to a portion of the Contribution Agreement dated September 13, 2004, regarding the sale of the Shopping Center.  [Pls. Ex. 61.]  Paragraph 1.8 of the Contribution Agreement states that the annual fee rebate payments were not transferred as part of the sale of the Shopping Center.  [*Id.* at 2–3.]  This paragraph does not limit the time in which either Plaintiff could receive annual fee rebate payments or the parcels for which either Plaintiff could receive annual fee rebate payments.  [*Id.*]  The

purpose of this paragraph simply addresses which party retained the right to the annual fee rebate payments.

39.     The City also points to the December 21, 2005, letter from Mr. Drennan to Mr. King confirming that when Gordon Farms sold the Shopping Center to Excel, it retained the right to keep the rebate payments.  [Def. Ex. 29.]  This letter attached an excerpt from the Contribution Agreement—language that was drafted prior to September 13, 2004—that gave Gordon Farms the right to keep the annual fee rebate payments on the Shopping Center.  [*Id.*]  Mr. Floyd testified that the City required him to have his attorney send this letter so there would be no dispute about who was entitled to those payments. [Tr. 303:2–11.]

40.     The Court considers the Contribution Agreement and Mr. Drennan's December 2005 letter to be among the most persuasive evidence in support of the City's assertion that the Extended Agreement was never made.  Assuming that the Extended Agreement had been made in the second half of 2004, one would expect that the language in the Contribution Agreement would have been updated before the February 2005 sale. Still, that the Contribution Agreement was not updated could be the result of several different factors, including perhaps that Mr. Floyd, in directing his attorney to move forward with the sale, may not have even told Mr. Drennan about the agreement. Given that Mr. Floyd had nothing in writing to memorialize the K-Mart Agreement, it does not strain reason to believe that Mr. Floyd may not have involved counsel in as many aspects of his business as other people with millions of dollars at stake might have.

41.     As for Mr. Drennan's December 21, 2005, letter, Mr. Memmott corroborated Mr. Floyd's testimony and testified that he did not want the buyer of the Shopping Center

to claim entitlement to the rebate payments for the Shopping Center, so he required written assurance of which entity was entitled to receive the rebate payments.  [Tr. 513:1–20.] That appears to be the assurance that Mr. Drennan provided through his December 21, 2005, letter, which simply confirms that all rebate payments for the Shopping Center should go to Gordon Farms and does not mention the K-Mart Agreement or the Extended Agreement.  [Def. Ex. 29.]  That Mr. Drennan did not take the opportunity in this letter to document the Extended Agreement, for reasons similar to those just discussed, does not conclusively prove that the Extended Agreement was not made.

42.     The City also argues that it is not believable that Mr. Memmott would seek to have the rebates under the Extended Agreement paid to Gordon Farms instead of Mr. Floyd.  [Tr. 830:1–6.]  The Court concludes that this issue does not weigh significantly in favor of either side's version of events.  On one hand, the Court agrees with the City that it did not stand to benefit financially from paying the rebates to Gordon Farms rather than Mr. Floyd.  On the other hand, given that Gordon Farms was the entity being incentivized to sell the Shopping Center under the Extended Agreement, it does not strike the Court as illogical under the impromptu agreement that Gordon Farms would receive the benefit under the Extended Agreement.

43.     The City further contends that Mr. Memmott and Mr. Floyd would not have entered into the Extended Agreement because the IGA would not have allowed it. [Tr. 843:12–23.]   The simple response to that contention is that Mr. Floyd had no knowledge of the IGA [Tr. 60:8–15] and Mr. Memmott demonstrated by entering the K-Mart

Agreement that he was willing to extend rebate periods under the Program "administratively" when doing so suited the City's interests.[14]

44.     In sum, considering all of these factors together, the Court concludes that Mr. Floyd was a far more credible witness than Mr. Memmott, and the fact that the records of the City prior to 2017 did not reflect any separate treatment for the K-Mart Parcel convinces the Court that Mr. Floyd's testimony describing Mr. Memmott's offer on behalf of the City and Mr. Floyd's acceptance of the Extended Agreement was accurate.  Accordingly, for the reasons discussed, the Court concludes that Plaintiffs demonstrated by a preponderance of the evidence an offer by Mr. Memmott on behalf of the City to enter into the Extended Agreement and an acceptance by Mr. Floyd on behalf of Gordon Farms.

    <u>Consideration</u>

45.     Additionally, the Court concludes that Plaintiffs proved by a preponderance of the evidence that the Extended Agreement was supported by valuable consideration.

46.     Mr. Floyd testified that as part of the Extended Agreement, he and Gordon Farms agreed to sell the Shopping Center for a lower price than they would have accepted without the extension of the rebate period because the Extended Agreement gave them a way to recoup some of that lost money.  [Tr. 96:13–20.]  In exchange, Gordon Farms would receive additional years of annual fee rebate payments.  [Tr. 94:25–95:8.]

47.     The City agreed to extend the annual fee rebate payments in return for Plaintiffs' agreement to sell the Shopping Center to Excel, which would benefit the City.

---

[14] The City did not argue at trial that the IGA—which Plaintiffs were not parties to and were not even aware of—would protect the City from liability under the Extended Agreement even if Mr. Memmott agreed to it and it was supported by adequate consideration.

[Tr. 92:15–94:13, 99:25–100:11, 550:4–25.]  Whether the City actually benefitted from the Extended Agreement is immaterial to the issue of whether the agreement was supported by consideration; however, as stated, the evidence suggests that the sale of the Shopping Center benefitted the City through increased tax revenue and national tenants leasing spaces in the Shopping Center and paying higher rents.  [*See* Pls. Ex. 98; Tr. 94:5–9, 118:20–119:3.]

48.     Accordingly, the Court concludes that Plaintiffs established by a preponderance of the evidence that the Extended Agreement was supported by valuable consideration.  And, because the Court also concludes that Plaintiffs proved by a preponderance of the evidence that the City made an offer that Plaintiffs accepted, Plaintiffs demonstrated by a preponderance of the evidence that a valuable and enforceable contract exists.

### *Breach of the Extended Agreement*

49.     The Court also concludes that Plaintiffs demonstrated by a preponderance of the evidence that the City breached the Extended Agreement.

50.     A breach of contract is defined as a "[v]iolation of a contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance."  *Breach of contract*, Black's Law Dictionary (11th ed. 2019).

51.     It is undisputed that the City stopped making annual fee rebate payments to Gordon Farms under the Program following tax year 2016.  [Pls. Exs. 10; 11; 12.]

52.     Under the terms of the Extended Agreement, Gordon Farms was entitled to receive annual fee rebate payments for 15 years following the completion of Specialty Row's redevelopment—which occurred in 2007 [Tr. 121:16–17]—or until the total of annual

rebate payments reached the Cap, whichever occurred first. The uncontroverted record evidence established that the Cap would not have been reached until tax year 2021. [Tr. 150:5–19.]

53.    Therefore, the City's failure to make any annual fee rebate payments to Gordon Farms following the payment for tax year 2016 is a breach of the Extended Agreement.

### Damages

54.    "'The general rule is that for a breach of contract the defendant is liable for whatever damages follow as a natural consequence and a proximate result of such breach.'" *Branche Builders, Inc.*, 686 S.E.2d at 202 (quoting *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962)).

55.    "When there is a breach, the amount of damages should put the non-breaching party in the position he would be in had the contract been performed." *Hughes v. Oconee Cnty.*, No. 2007-UP-461, 2007 WL 8392131, at *8 (S.C. Ct. App. Oct. 11, 2007).

56.    The Court concludes that Plaintiffs demonstrated by a preponderance of the evidence that Gordon Farms suffered damages as a direct and proximate result of the City's breach of the Extended Agreement.

57.    The evidence presented at trial establishes that, under the Extended Agreement, the new 15-year annual fee rebate period would begin once the work on Specialty Row was complete and that the work was completed in 2007. [Tr. 95:9–23, 121:16–24; *see also* Pls. Ex. 23.] Thus, Gordon Farms was entitled to receive annual

rebate payments under the Extended Agreement for the next 15 years or until the payments totaled the Cap amount, whichever came first.  [Tr. 95:9–23.]

58.     As noted, the Cap for the Shopping Center was $3,046,101.00.  [Pls. Ex. 1; Tr. 62:1–63:10.]  Plaintiffs received annual fee rebate payments totaling $2,244,592.49 for tax years 2000 through 2016.  [Pls. Exs. 7a–7q.]  The difference between the Cap and the total amount received by Plaintiffs is $801,508.51.  Thus, Gordon Farms was entitled to receive annual rebate payments under the Extended Agreement for 15 years or until the payments totaled $801,508.51.

59.     The table below demonstrates that the payments to Plaintiffs would have exceeded the Cap in tax year 2021, before Gordon Farms would have received 15 years of annual rebate payments under the Extended Agreement.  The City received the following amounts from the County for tax years 2017 through 2021 related to the Shopping Center: $448,494.00; $491,213.00; $460,250.00; $460,250.34; and $462,160.51.  [Pls. Ex. 98 at 3, 11–13.]  These amounts represent 70 percent of the Increment attributable to the Shopping Center for each respective tax year.  [*Id.*; Tr. 275:23–276:20.]  Gordon Farms should have received 30 percent of the Increment attributable to the Shopping Center for each tax year it was eligible to receive rebate payments.  [Pls. Ex. 16 ¶ 5(C); Tr. 276:10–20.]  Therefore, to calculate Gordon Farms' 30 percent, the Court divides the amount the City received from the County by 0.7 to determine the Increment and then multiplies the Increment by 0.3 to determine the amounts Gordon Farms should have received:

| Tax Year | Amount from County (70% of Increment) | The Increment | Amount to Gordon Farms (30% of Increment) |
|---|---|---|---|
| 2017 | $448,494.00 | $640,705.71 | $192,211.71 |
| 2018 | $491,213.00 | $701,732.86 | $210,519.86 |
| 2019 | $460,250.00 | $657,500.00 | $197,250.00 |
| 2020 | $460,250.34 | $657,500.49 | $197,250.15 |
| 2021 | $462,160.51 | $660,229.30 | $198,068.79 |
| | | Total: | $995,300.51 |

60.    Therefore, Gordon Farms is entitled to receive $801,508.51, the difference between the Cap and what it received from the City in annual rebate payments for tax years 2000 through 2016.

61.    Accordingly, Gordon Farms is entitled to an award of $801,508.51.

62.    Plaintiffs have also requested an award of prejudgment interest [Tr. 817:9–12], but the Court has not received any briefing regarding prejudgment interest. Accordingly, if the Plaintiffs move for prejudgment interest, the Court will address it at that time.

## <u>CONCLUSION</u>

Accordingly, for the reasons stated above, the Court finds that judgment shall be entered in favor of Plaintiffs and against the City on Plaintiffs' breach of contract claim, and Gordon Farms is awarded $801,508.51 in actual damages.

IT IS SO ORDERED.

<u>s/Jacquelyn D. Austin</u>
United States Magistrate Judge

September 30, 2023
Greenville, South Carolina